CHARLES B. ROGERS AND LAVEDA M. ROGERS, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Rogers v. Commissioner
Docket Nos. 27353-86, 43568-86, 44611-86, 4215-87, 4317-87, 25670-87
United States Tax Court
T.C. Memo 1990-619; 1990 Tax Ct. Memo LEXIS 695; 60 T.C.M. (CCH) 1386; T.C.M. (RIA) 90619; December 10, 1990, Filed *695 Decision will be entered under Rule 155. Douglas R. Thompson, for the petitioners. Richard J. Wood and Robert N. Trgovich, for the respondent. GERBER, Judge. *697 GERBER
*2005 MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined the following deficiencies and additions [2] to petitioners' Federal income tax: Petitioners/Rogers - Dkt. No. 27353-86 Additions to Tax Year
Deficiency
Sec. 6653(a) [3]
Sec. 6659
1979
$ 2,499.00
$ 124.95 $  749.70
1980
2,546.00
127.80 763.80
1981
2,500.00
* 125.00 750.00
1982
7,218.00
* 360.90 2,165.40
Petitioners/Moss - Dkt. No. 43568-86
Additions to Tax Year
Deficiency
Sec. 6659
Sec. 6661
1982
$ 15,310.00
$ 3,900.00
$ 231.00
*698 Petitioners/Morgan-Dkt. No. 44611-86
Additions to the Tax Year
Deficiency
Sec. 6653(a)
Sec. 6659
Sec. 6661
1982
$ 15,573.00
$ 778.65 *
$ 3,900.00
$ 257.30
1983
394.00
19.70 *
--   --
Petitioners/Johnson-Dkt. No. 4215-87 Additions to Tax Year
Deficiency
Sec. 6653(a)
Sec. 6659
Sec. 6661
1979
$  2,658.00
$ 132.90
$   797.40
$   --
1982
12,388.17
619.41 *
3,102.60
511.54
Petitioners/McEvoy-Dkt. No. 4317-87 Additions to the Tax
Year
Deficiency
Sec. 6653(a)
Sec. 6659 Sec. 6661
1982
$ 14,181.92
$ 709.10 *
$ 3,698.40
$ 463.48
1983
987.00
49.35 *
--
--
*2006 *699 Petitioners/Ridgeway-Dkt. No. 25670-87
Additions to Tax
Year
Deficiency
Sec. 6653(a)
Sec. 6659
1979
$  8,912.00
$ 445.60  $ 2,673.60
1982
18,155.53
907.78 *
1,285.50
The issues in these consolidated cases involve petitioners' leases of energy management devices from O.E.C. Leasing Corporation (OEC). [4] Because petitioners have conceded the correctness of the income tax portion of the deficiency, the remaining issues are: (1) Whether some [5] petitioners are liable for the additions to tax for negligence, section 6653(a); (2) whether any petitioners are liable *700 for additions to tax for overvaluation, section 6659; (3) whether some petitioners are liable for additions to tax for substantial understatement, section 6661; and (4) whether petitioners are liable for the increased rate of interest on tax-motivated transactions under section 6621(c), I.R.C. 1986. *701 FINDINGS OF FACT General Factual Background
The stipulation of facts and attached exhibits are incorporated herein by this reference. Respondent determined, in the notices of deficiency, that petitioners [6] were not entitled to their claimed investment tax and energy credits and deductions in connection with a leasing transaction involving energy equipment. Petitioners have conceded that they are not entitled to the credits and deductions, but continue to contest the applicability of the additions to tax and increased interest. At least one of each set of petitioners attended a meeting during the late fall of 1982, conducted by J. Wayne Collins (Collins), who was a representative and agent of OEC. Most petitioners were aware or believed that Collins would receive a commission or some income for his part in inducing "investment" *702 in the OEC transaction. The purpose of the meeting was to promote or solicit participation in a leasing program. Under that program individuals were to lease an energy system (system) which controlled energy devices to save money on utility bills. The systems were to be installed with end-user establishments, which would be obligated to pay a portion of their energy savings back to the lessee and lessor. OEC was to purchase the systems for lease to investing participants. The participants, in turn, would operate their own leasing business and lease the system to the end user. Petitioners attended the meeting based upon the recommendation of their accountant, Chandler Russell (Russell). Russell prepared the 1982 returns of all petitioners before the Court, and in some cases he had prepared prior year tax returns. In some instances, Russell had provided investment and tax advice to petitioners in years prior to 1982. At the meeting, petitioners received promotional materials concerning the leasing program, the system, a tax opinion which had been prepared for OEC, and projections regarding the leasing program. The tax opinion indicated that the terms of the transaction were *703 highly unusual and not indicative of typical transactions in the energy savings field. The tax opinion also indicated that it was essential that "investors" be independent from OEC (not a partner or joint venturer) and that they be engaged in the operation of a business in order obtain the benefit of the income and energy credits. The promotional materials alerted "investors," that as a lessee of a system, they would be responsible for marketing, installation, and maintenance of the system. The materials highlighted the "tax writeoff and cash benefit" and the main promotional brochure (which explained the program) featured the following chart preceding the text: ENERGY CONTROL SYSTEMS
EQUIPMENT LEASING PROGRAM FIRST YEAR ESTIMATED TAX WRITEOFF AND CASH BENEFITS ASSUMING 50% BRACKET TAXPAYER SYSTEM 1
SYSTEM 2 COST BASIS of
Energy Control System
$ 65,000
$ 175,000
Advanced guaranteed
rental payment
$ 5,000
$ 15,000
TAX BENEFITS
Investment tax
credit-10% of Cost
$ 6,500
$ 17,500
Energy Tax
credit-10% of Cost
6,500
17,500
Total Tax Credits
$ 13,000
$ 35,000
Tax Savings (50%)
on advanced guaranteed
rental payment
2,500
7,500
Total Tax Benefits in
Year of Acquisition
$ 15,500
$ 42,500
Positive Cash Benefit
for Year of Acquisition
$ 10,500
$ 27,500
*704 *2007 SYSTEM 3
COST BASIS of
Energy Control System
$ 280,000 Advanced guaranteed
rental payment
$ 25,000
TAX BENEFITS
Investment tax
credit-10% of Cost
$ 28,000 Energy Tax
credit-10% of Cost
28,000 Total Tax Credits
$ 56,000 Tax Savings (50%)
on advanced guaranteed
rental payment
12,500
Total Tax Benefits in
Year of Acquisition
$ 68,500
Positive Cash Benefit
for Year of Acquisition
$ 43,500
Does not include: (1) any first-year service income from energy savings. (2) initial location fee, if service company is retained. (3) any state or local tax impositions. These projections were prepared by the Lessor. They represent an estimate of certain tax and economic benefits. Each Lessee is advised to consult with his own professional tax advisor with respect to these illustrations. Petitioners relied upon the representations contained in the promotional materials. Petitioners were aware of the tax benefits. Petitioners did not consult with experts in the field of energy management equipment leasing prior to investing in the OEC transaction. None of petitioners had expertise in energy management equipment or the leasing of *705 the same prior to their "investment." Petitioners also relied upon Russell, who held himself out as a specialist in tax and investment advice. Russell limited his advice to the tax aspects of investments. His partner, who was not involved in this matter, provided advice about general business aspects concerning investments. Russell spent about 40 to 80 hours reviewing the promotional materials that had been given to petitioners. Russell attended the meeting with Collins. Russell analyzed the promotional materials with respect to the tax aspects and financial profitability. Russell had no expertise in the energy field, no engineering background, and no specialized expertise in the operation or appraisal of energy saving devices. Russell relied upon OEC for all factual representations in the promotional material. Russell recommended petitioners' involvement in the program. The mechanics of the OEC transaction are identical in most respects to the transactions described in Soriano v. Commissioner, 90 T.C. 44 (1988); Heasley v. Commissioner, T.C. Memo. 1988-408, revd. 902 F.2d 380 (5th Cir. 1990); Kaba v. Commissioner, T.C. Memo. 1989-148; *706 Keenan v. Commissioner, T.C. Memo. 1989-300; and several other opinions involving "OEC leasing transactions." Briefly, it involved the purchase by OEC of devices to save energy in industrial and commercial facilities. These would be leased to investors who, in turn, were to have them installed and serviced by an unrelated service company in the facility of a third-party end user. Any energy savings would be split by the investor and the end user, with a percentage of savings retained by the service company as service fees and OEC as rental payments. The energy savings would be retained by the participants in the following percentages: End User:
50 percent
Service Company:
7.5 percent
Lessor (OEC):
31.88 percent
Lessee:
10.62 percent
The end users were not required to make any payments, other than sharing energy savings, in connection with their use of the devices. Prior to installation, the service company would conduct an "energy audit" to determine a suitable end-user location. The investor would also pay initial amounts for the first year's rental and an installation charge. The investor/lessee claimed tax deductions for advanced rental *707 and installation charges, and investment tax credits under section 48(d), based on the purchase price OEC paid for the units. The units themselves are electronic devices designed to regulate oil, gas, steam, and electrical usage, thereby conserving energy to the end user. During 1982 there were a number of such devices on the market. The cost of such a system is based upon its capabilities and the number of *2008 functions it can perform. The report prepared by respondent's expert [7] explains these factors in greater detail, reflecting the complexity of the device. The energy management system market is a large market, heavily advertised in the trade. During 1982, a unit comparable to the Energy Management Systems (EMS) *708 I, II, and III could have been purchased for approximately $ 1,500, $ 1,600, and $ 4,800, respectively. The fair market value, during 1982, of the EMS I, II, and III is $ 1,500, $ 1,600, and $ 4,800, respectively. The 1982 promotional materials provided to petitioners contained the statement that the value of the EMS I, II, and III was $ 65,000, $ 175,000, and $ 280,000, respectively. The ultimate profitability (without considering tax benefits) of the venture to OEC and its lessees was dependent upon a number of factors, including the initial advanced rental and installation expenditures, annual energy bill, actual cost savings to the end user, the rate of inflation for energy costs, and useful physical and economic life of the equipment. For example, the advanced rental for an EMS III was $ 25,000 per unit, while installation was $ 2,150. The minimum annual energy bill that would justify use of the EMS III was $ 90,000. Based on a 1982 Department of Energy (DOE) report, energy costs were forecast to increase, on the average, 3.8 percent (electricity - 2.0 percent, gas - 9.1 percent, oil - 4.3 percent). This is a weighted average for the typical industrial/commercial fuel *709 combination. Considering a 7-percent inflation rate, the annual rate of energy cost increase would be 10.8 percent. DOE reports for earlier periods had projected cost increases of some 20 percent. The percentages and relative figures for EMS I and II units are substantially similar. Actual energy savings to a particular end user may vary significantly, depending on physical characteristics of the facility and energy conservation measures which may have been employed prior to installation of an energy management system. Industry reports predicted 5 to 12-percent savings with a maximum of approximately 20 percent. Actual savings are often less than projected. We agree with respondent's expert that 10 percent is a reasonable assumption. Optimistic estimates of the engineering useful life of these units is 20 to 25 years. Engineering or physical useful life is the length of time the unit may remain operational with normal repairs. The units in question were warranted for only 1 year. Electronic equipment is also subject to obsolescence (economic useful life); while the unit is still operative, it may nonetheless be more cost-effective to replace it with newer, more efficient *710 technology. These units are also subject to obsolescence or failure of the underlying climate control units (central heating or air-conditioning units). When these are replaced, the new units often incorporate internal energy management control systems. These devices have a useful life of approximately 10 years. Using these assumptions, one can obtain projected cash flows for the lease of an EMS unit. Discounting this future cash flow to present value, to take into account the time value of money, is a way that has been used to measure the economic viability of these transactions. See Soriano v. Commissioner, 90 T.C. 44 (1988); Kaba v. Commissioner, T.C. Memo. 1989-148; Keenan v. Commissioner, T.C. Memo. 1989-300. The discount rate reflects the risk of the venture and expected return. The prime rate in 1982 was approximately 15 percent. This is a considerably riskier venture due to chances of equipment failure, energy cost variability, and failure to achieve expected savings. Twenty percent would be a minimum rate of return required by investors to compensate for that risk. In the industry, these systems are expected to *711 pay back in 1 to 3 years an approximate 30-percent return. Using the 20-percent rate, the discounted cash flow from the lease of an EMS III, consisting of anticipated payments from end users less advanced rental and installation fees, is a negative $ 13,959, as computed by respondent's expert. [8] Thus, the lease of a unit is not an economically viable transaction. *712 Under the terms of an OEC lease concerning energy minders an investor would experience negative cash flow, negative net present value of cash flow, and negative *2009 internal rate of return, as follows: Item
EMS I
EMS II
EMS III
Negative cash flow
$ 2,043.00
$ 3,829.00
$  7,769.00
Negative net present
value of cash flow
3,366.00
8,181.00
13,959.00
Negative internal
rate of return
7.8% 5.4% 6.9% Findings - Petitioners/Rogers
Petitioners/Rogers resided in Atlanta, Georgia, when the petition was filed in this case. Petitioner-husband/Rogers (Rogers) attended the OEC informational meeting. Rogers had been either a partner or sole proprietor of a photography business for 12 years as of 1982. Rogers was familiar with photography before he engaged in that business. Rogers' educational background was the equivalent of the completion of one year of college. For 1982, Rogers reported the income and deductions of his photography business on a Schedule C, entitled "Profit or (Loss) From Business or Profession." Rogers in 1982 invested $ 5,250 ($ 5,000 of which was claimed as rent and $ 250 as an installation fee), all of which was claimed *713 as deductions and a loss for 1982. Rogers reported his OEC activity as his leasing business involving energy devices on a Schedule C, entitled "Profit or (Loss) From Business or Profession." In addition to the $ 5,250 loss claimed for 1982, Rogers also claimed credits against tax in the total amount of $ 13,000. The credits against tax were for the investment tax credit ($ 6,500) and the energy credit ($ 6,500), each of which represented 10 percent of $ 65,000, the purported value of the system leased by Rogers. The combination of the OEC loss and credits generated a reduction in petitioners/Rogers' 1982 tax liability, along with a small refund of some withheld tax. The investment tax and energy credits generated refunds of most of the Federal income tax that had been paid by petitioners/Rogers for their 1979, 1980, and 1981 taxable years. Rogers did not understand the details of the OEC leasing transaction and he believed that he had purchased, rather than leased, a system. Rogers believed that the $ 5,000 "was for the purchase of the unit." Rogers had no expertise concerning the system or its value and relied upon the promotional material and Russell's recommendation concerning *714 the tax aspects and potential for profit. Rogers did not know whether the system he allegedly leased had been installed with an end user or the name of his end user, if any, prior to the end of 1982. Rogers did not take many steps to determine if the EMS unit allegedly leased had been received by an end user. Rogers did not receive any money or revenue from his OEC "investment." Rogers spent little, if any, time and effort on the energy management equipment leasing transaction and he made no independent investigation into the value of a system. Rogers, presumably [9] subsequent to 1982, filed for relief regarding his involvement in the OEC transaction under the Witness and Victim Protection Act of 1982. Findings - Petitioners/Moss
Petitioners/Moss resided *715 in Malibu, California, at the time the petition was filed in their case. Petitioner-wife/Moss (Moss) attended the informational meeting, during the late fall of 1982, conducted by Collins. At the meeting, Moss received the promotional materials. Moss had been a bookkeeper prior to becoming involved in the OEC transaction in 1982. Moss' husband was in the insurance business during the same period. Petitioners/Moss, during 1982, invested $ 5,250 ($ 5,000 of which was claimed as rent and $ 250 as an installation fee), all of which was claimed as deductions and a loss for 1982. Petitioners/Moss reported their OEC activity as a leasing business involving energy devices on a Schedule C, entitled "Profit or (Loss) From Business or Profession." In addition to the $ 5,250 loss claimed for 1982, petitioners/Moss also claimed credits against tax in the total amount of $ 13,000. The credits against tax were for the investment tax credit ($ 6,500) and the energy credit ($ 6,500), each of which was based upon 10 percent of $ 65,000, the purported value of the system leased by petitioners/Moss. The $ 13,000 in tax credits reduced petitioners/Moss' tax liability for 1982 from $ 13,846 to $ *716 846, thereby permitting a $ 30,643 refund of tax withheld from Moss' husband's $ 111,401 compensation from Pennsylvania Life Insurance Company. Moss did not understand the details of the OEC leasing transaction and believed that she had purchased, rather than leased, a system. Petitioners/Moss had no expertise concerning the system or its value and relied upon the promotional material and Russell's recommendation concerning the tax aspects and potential for profit. Moss did not know whether the system allegedly leased had been installed with an end user or the name of her end user, if any, prior to the end of 1982. Petitioners/Moss did not take many steps to determine if the system allegedly leased had been received by an end user. Petitioners/Moss did not receive any money or revenue from their OEC "investment." Moss spent little, if any, time and effort on the energy management equipment leasing transaction, and she made no independent investigation into the value of a system. *2010 Petitioners/Moss, presumably subsequent to 1982, filed for relief regarding involvement in the OEC transaction under the Witness and Victim Protection Act of 1982. Findings - Petitioners/Morgan
*717 Petitioners/Morgan resided outside the United States in Mississauga, Ontario, Canada, at the time the petition was filed in their case. Petitioner-husband/Morgan (Morgan) had a college degree in business administration and has been a businessman since 1955. He had no expertise in energy devices and realized that Russell's expertise and advice concerned the tax and financial aspects of the OEC transaction with the assumption that the factual basis stated in the promotional materials was correct. Russell was petitioners/Morgan's accountant and he regularly prepared their income tax returns. Morgan attended the informational meeting, during the late fall of 1982, conducted by Collins. At the meeting, Morgan received the promotional materials. Morgan was employed by A. L. Williams Insurance Agency as president of their Canadian operation during and prior to his involvement in the OEC transaction in 1982. Morgan's wife was also employed in the insurance business during the same period. Petitioners/Morgan, during 1982, invested $ 5,250 ($ 5,000 of which was claimed as rent and $ 250 as an installation fee), all of which was claimed as deductions and a loss for 1982. Petitioners/Morgan *718 reported their OEC activity as a leasing business involving energy devices on a Schedule C, entitled "Profit or (Loss) From Business or Profession." In addition to the $ 5,250 loss claimed for 1982, petitioners/Morgan also claimed credits against tax in the total amount of $ 13,000. The credits against tax were for the investment tax credit ($ 6,500) and the energy credit ($ 6,500), each of which was based upon 10 percent of $ 65,000, the purported value of the system leased by petitioners/Morgan. The $ 13,000 in tax credits reduced petitioners/Morgans' tax liability for 1982 from $ 20,888 to $ 7,888, thereby permitting a $ 16,528 refund of tax withheld from the Morgans' $ 97,009 compensation from Pennsylvania Life Insurance Company and A. L. Williams Insurance Agency. For 1983 petitioners/Morgan deducted an additional $ 895 on a Schedule C for insurance ($ 145) and installation ($ 750). Morgan did not generally understand the details of the OEC leasing transaction. Morgan had no expertise concerning the system or its value and relied upon the promotional material and Russell's recommendation concerning the tax aspects and potential for profit. Morgan did not know whether the *719 system allegedly leased had been installed with an end user or the name of his end user, if any, prior to the end of 1982. Petitioners/Morgan did not pay the installation fee until 1983, in which year they claimed said amount as a deduction on their Schedule C. Petitioners/Morgan did not receive any money or revenue from the OEC transaction. Morgan spent little time and effort on the energy management equipment leasing transaction and he made no independent investigation into the value of a system. Petitioners/Morgan, presumably subsequent to 1982, filed for relief regarding involvement in the OEC transaction under the Witness and Victim Protection Act of 1982. Findings - Petitioners/Johnson
Petitioners/Johnson resided in Roswell, Georgia, at the time the petition was filed in their case. Petitioner-husband/Johnson (Johnson) had a college degree in history and was a vice president of sales for Spectra Scan, a company providing diagnostic imaging services to primary care physicians. He had no expertise in energy devices and realized that Russell's expertise and advice concerned the tax and financial aspects of the OEC transaction with the assumption that the factual *720 basis stated in the promotional materials was correct. Russell was petitioners/Johnsons' accountant and he regularly prepared their income tax returns. Johnson attended the informational meeting, during the late fall of 1982, conducted by Collins. At the meeting, Johnson received the promotional materials. Johnson read the materials and was familiar with the details of the leasing transaction. Petitioners/Johnson, during 1982, invested $ 5,250 ($ 5,000 of which was claimed as rent and $ 250 as an installation fee), all of which was claimed as deductions and a loss for 1982. Petitioners/Johnson reported their OEC activity as a leasing business involving energy devices on a Schedule C, entitled "Profit or (Loss) From Business or Profession." In addition to the $ 5,250 loss claimed for 1982, petitioners/Johnson also claimed credits against tax in the total amount of $ 13,000. The credits against tax were for the investment tax credit ($ 6,500) and the energy credit ($ 6,500), each of which was based upon 10 percent of $ 65,000, the purported value of the system leased by petitioners/Johnson. The $ 13,000 in tax credits reduced petitioners/Johnsons' tax liability for 1982 from *721 $ 11,011 to zero, thereby permitting a $ 11,158 refund of tax withheld from Johnson's $ 71,758.18 compensation from his wages for 1982. The remaining $ 2,658 in credits was carried back to petitioners/Johnsons' 1979 taxable year, which generated an additional refund of tax paid in connection with 1979 income in the amount of $ 2,658. Johnson had no expertise concerning the system or its value and relied upon the promotional material and Russell's recommendation concerning the tax aspects and potential for profit. Johnson did not know whether the system allegedly *2011 leased had been installed with an end user or the name of his end user, if any, prior to the end of 1982. Petitioners/Johnson did not receive any money or revenue from the OEC transaction. Johnson spent little time and effort on the energy management equipment leasing transaction, and he made no independent investigation into the value of a system. Petitioners/Johnson, presumably subsequent to 1982, filed for relief regarding involvement in the OEC transaction under the Witness and Victim Protection Act of 1982. Findings - Petitioners/McEvoy
Petitioners/McEvoy resided in Dunwoody, Georgia, at the time the petition *722 was filed in their case. Petitioner-husband/McEvoy (McEvoy) had been a pilot in the United States Air Force and, since 1973, he was a pilot employed by Delta Air Lines. He had no expertise in energy devices and realized that Russell's expertise and advice concerned the tax and financial aspects of the OEC transaction with the assumption that the factual basis stated in the promotional materials was correct. Russell was petitioners/McEvoys' accountant and he prepared their 1982 and subsequent income tax returns. McEvoy attended the informational meeting, during the late fall of 1982, conducted by Collins. At the meeting, McEvoy received the promotional materials. Petitioners/McEvoy, during 1982, invested $ 5,250 ($ 5,000 of which was claimed as rent and $ 250 as an installation fee), all of which was claimed as deductions and a loss for 1982. Petitioners/McEvoy reported their OEC activity as a leasing business involving energy devices on a Schedule C, entitled "Profit or (Loss) From Business or Profession." In addition to the $ 5,250 loss claimed for 1982, petitioners/McEvoy also claimed credits against tax in the total amount of $ 13,000. The credits against tax were for the *723 investment tax credit ($ 6,500) and the energy credit ($ 6,500), each of which was based upon 10 percent of $ 65,000, the purported value of the system leased by petitioners/McEvoy. Twelve thousand three hundred twenty-eight dollars of the $ 13,000 in tax credits reduced petitioners/McEvoys' income tax liability for 1982 from $ 12,328 to zero, thereby permitting a $ 10,832 refund of tax withheld from McEvoys' $ 72,507 in compensation from his wages for 1982. An additional $ 672 in income tax credits was carried forward to petitioners/McEvoys' 1983 taxable year, which generated an additional refund of tax paid in connection with 1983 income in the amount of $ 672. Petitioners/McEvoy also claimed an $ 895 loss from the OEC activity for 1983 comprised of $ 145 insurance and $ 750 installation expenses. No income was reported in 1982 or 1983 from the OEC leasing transaction. McEvoy had no expertise concerning the system or its value and relied upon the promotional material and Russell's recommendation *2012 concerning the tax aspects and potential for profit. McEvoy did not know whether the system allegedly leased had been installed with an end user or the name of his end user, if any, *724 prior to the end of 1982. McEvoy spent little time and effort on the energy management equipment leasing transaction, and he made no independent investigation into the value of a system. Petitioners/McEvoy, presumably subsequent to 1982, filed for relief regarding involvement in the OEC transaction under the Witness and Victim Protection Act of 1982. Findings - Petitioners/Ridgeway
Petitioners/Ridgeway resided in Stone Mountain, Georgia, at the time the petition was filed in their case. Petitioner-husband/Ridgeway (Ridgeway) is a computer programmer and had been an officer of Con Data Corporation for 18 years. He had no expertise in energy devices and realized that Russell's expertise and advice concerned the tax and financial aspects of the OEC transaction with the assumption that the factual basis stated in the promotional materials was correct. Ridgeway did not understand all aspects of the leasing transaction. Russell was petitioners/Ridgeways' accountant and he prepared their 1982 income tax return. Ridgeway attended the informational meeting, during the late fall of 1982, conducted by Collins. At the meeting, Ridgeway received the promotional materials. Petitioners/Ridgeway, *725 during 1982, invested $ 5,250 ($ 5,000 of which was claimed as a rental fee and $ 250 as an installation fee), all of which was claimed as deductions and a loss for 1982. Petitioners/Ridgeway reported their OEC activity on a Schedule C, entitled "Supplemental Income Schedule." In addition to the $ 5,250 loss claimed for 1982, petitioners/Ridgeway also claimed credits against tax in the total amount of $ 13,000. The credits against tax were for the investment tax credit ($ 6,500) and the energy credit ($ 6,500), each of which was based upon 10 percent of $ 65,000, the purported value of the system leased by petitioners/Ridgeway. A combination of deductions and credits reduced petitioners/Ridgeway's 1982 income tax liability $ 4,285, which assisted in generating a $ 24,776 refund of tax withheld from petitioners/Ridgeways' $ 90,000 in compensation from wages for 1982. An additional $ 8,912 was carried back to petitioners/Ridgeways' 1979 taxable year, generating additional refunds. No income was reported in 1982 from the OEC leasing transaction. Ridgeway had no expertise concerning the system or its value and relied upon the promotional material and Russell's recommendation concerning *726 the tax aspects and potential for profit. Ridgeway did not know whether the system allegedly leased had been installed with an end user or the name of his end user, if any, prior to the end of 1982. Ridgeway spent little time and effort on the energy management equipment leasing transaction, and he made no independent investigation into the value of a system. Petitioners/Ridgeway, presumably subsequent to 1982, filed for relief regarding involvement in the OEC transaction under the Witness and Victim Protection Act of 1982. ULTIMATE FINDINGS OF FACT The systems (EMS I units) involved in the transactions of each group of petitioners in these cases had a fair market value of $ 1,500 during 1982. The $ 65,000 value reported by each group of petitioners in connection with their claim for $ 13,000 in tax credits was overvalued 43.33 times, or an overvaluation of 4,333 percent of the fair market value. The motivation of each petitioner herein who became involved during 1982 in the OEC leasing transaction was to seek the tax benefits. Each petitioner who was involved in an OEC leasing transaction could not have made a profit and therefore did not have an "actual and honest objective *727 of making a profit." OPINION Petitioners concede that they are not entitled to the claimed deductions and credits which related to the OEC transaction. The only issues remaining for our consideration involve the additions to tax and additional interest relating to petitioners' lease of energy management devices from OEC. The burden of proof is on petitioners to show they are not liable for these additions. Welch v. Helvering, 290 U.S. 111 (1933); Rule 142(a). Petitioners' main argument on brief is that they "conducted themselves as reasonable and ordinary prudent persons under the circumstances * * * with the intent of earning a profit * * * [and that they] relied upon the professional opinion of Chandler Russell, their personal accountant." Petitioners also contend that they have proven that the energy minders were not installed during the 1982 taxable year, which would require us to hold that the addition to tax for overvaluation is inapplicable under the holding in Todd v. Commissioner, 862 F.2d 540 (5th Cir. 1988), affg. 89 T.C. 912 (1987). To the contrary, respondent essentially argues that the entire record supports *728 the ultimate conclusion that petitioners did not have the objective to make a profit, but were motivated by their desire to obtain tax benefits and that the additions to tax and increased interest are applicable. We consider each addition to tax and increased interest separately. Section 6653(a) Addition to Tax for Negligence
We first address whether petitioners in cases with docket Numbers 27353-86, 44611-86, 4215-87, 4317-87, and 25670-87 are liable for the addition to tax under section 6653(a) for negligence. That section provides an addition to tax equal to 5 percent of the underpayment if any part of any underpayment is due to negligence, plus half of the interest on the underpayment (for 1981 through 1983 only) attributable to such negligence. Petitioners bear the burden of proving that they were not negligent. Bixby v. Commissioner, 58 T.C. 757 (1972); Enoch v. Commissioner, 57 T.C. 781 (1972). Negligence, within the meaning of section 6653, is the lack of due care or the failure to do what a reasonable or ordinarily prudent person *729 would do under the circumstances. Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967), cert. denied 389 U.S. 1044 (1968); Neely v. Commissioner, 85 T.C. 934, 947 (1985). In Heasley v. Commissioner, 902 F.2d 380, 383 (5th Cir. 1990), revg. T.C. Memo. 1988-408, the court defined "negligence" as "any failure to reasonably attempt to comply with the tax code, including the lack of due care or the failure to do what a reasonable or ordinarily prudent person would do under the circumstances." We take cognizance of this case because it also involved an OEC leasing transaction. In Heasley, the Circuit Court noted that the taxpayers were "moderate-income investors," unsophisticated, and that they monitored their investment. In rendering this opinion, we have also considered those factors. The question we must and have decided is whether a particular taxpayer's actions were reasonable in light of his experience, the nature of the investment or business, and his actions in connection with the transactions. It was petitioners' reliance upon the purported values of the energy minders and factual *730 statements made by the promoters that generated the tax credits and deductions in these cases. The purported value of the energy minders is the very thing that the taxpayers and their advisors in these cases did not verify. See Patin v. Commissioner, 88 T.C. 1086, 1130 (1987), affd. without published opinion sub nom. Hatheway v. Commissioner, 856 F.2d 186 (4th Cir. 1988), affd. sub nom. Skeen v. Commissioner, 864 F.2d 93 (9th Cir. 1989), affd. without published opinion 865 F.2d 1264 (5th Cir. 1989), affd. sub nom. Gomberg v. Commissioner, 868 F.2d 865 (6th Cir. 1989). See also Rybak v. Commissioner, 91 T.C. 524, 565-566 *2013 (1988); Marine v. Commissioner, 92 T.C. 958, 993 (1989); McCrary v. Commissioner, 92 T.C. 827, 850 (1989). In Skeen v. Commissioner864 F.2d 93, 96 (9th Cir. 1989), the Court of Appeals for the Ninth Circuit held it unreasonable to rely upon the expertise of a taxpayer's tax accountant because the advice concerned the plausibility of deductions in connection with a "gold program," rather than advice as to *731 the program's or deduction's "legality." A taxpayer may rely upon his advisor's expertise (in these cases accounting and tax advice), but it was not reasonable or prudent to rely upon tax advisors regarding matters outside of their field of expertise or with respect to facts which they did not verify. The expert relied upon by petitioners was rendering advice upon tax and accounting matters. The advisor did not hold himself out as an expert on the technical aspects, energy management business, or the value of energy management equipment. The advisor testified that he assumed that the facts represented by OEC were correct. In spite of this, the tax advisor was relied upon regarding the value, existence, and financial feasibility of energy minder systems being employed in unique leasing transactions. Also, neither the taxpayers nor their advisor verified the factual claims in the promotional materials or that the equipment existed prior to claiming the tax benefits. Here a computer-like device purportedly worth at least $ 65,000 was being leased. Even though petitioners purported to be in an individual proprietorship leasing energy minding equipment, not one of the "investors" *732 asked to see the device or be assured of its existence prior to "investing" and claiming relatively substantial deductions and credits in relation to his or her "investment." Based upon a $ 5,000 investment, petitioners were not in a position to lease a $ 65,000 piece of equipment which was allegedly capable of generating as much as $ 20,000 of income and an immediate cash return of about three times the $ 5,000 "investment" in the form of reduced tax liability or refunds of tax paid in prior years. The purported $ 65,000 equipment value equaled an amount approaching petitioners' annual incomes, and yet they were satisfied with representations of value in the promotional materials. Moreover, even though petitioners had not seen the piece of equipment and were not aware of its existence or installation, they "invested" and claimed the tax benefits. These factors lead us to the conclusion that these OEC transactions were distorted, unrealistic, and structured merely to obtain tax benefits. We consider here individuals who are personally setting out to engage in a complex leasing business involving a purportedly expensive and an obviously scientifically sophisticated piece of equipment. *733 They are not mere passive investors, but active business participants. They cannot avoid the negligence addition when they have wrongly claimed extraordinary tax benefits, merely because a tax advisor has read the prospectus and advised that it is feasible from a tax perspective, assuming the facts presented are true. In United States v. Boyle, 469 U.S. 241, 250 (1985), the Supreme Court found that the executor's reliance upon the estate's attorney to file the return (an obligation of the executor under the statute) was not reasonable and the Commissioner's determination of an addition to tax for late filing of the return was sustained. The Supreme Court expressed the principle that it is reasonable for a taxpayer to rely upon the advice of an attorney or accountant as to whether a tax liability exists because taxpayers are not competent to discern error in the substantive advice. We believe that these consolidated cases are governed by Boyle. It has not been shown that it was reasonable, in the setting of these cases, for petitioners to rely upon the expertise of a tax or financial advisor regarding the truth of the significant factual statements contained *734 in the promotional materials. It may have been reasonable to rely upon the tax advisor regarding the potential tax consequences, assuming the facts to be correct, but here it was petitioners' obligation to make a reasonable effort to verify that the $ 65,000 value reported for the systems upon which the $ 13,000 in tax credits were based was correct -- that is not a matter upon which the tax advisor's advice was rendered. The responsibility in this case is analogous to the type of responsibility with which the executor in Boyle was charged. In Boyle, the executor was required to timely file a return or risk incurring an addition to tax under section 6651. Here petitioners were required to use reasonable care in reporting their income, deductions, and credits or risk being liable for an addition to tax under section 6653(a)(1) ("due to [the taxpayer's] negligence or intentional disregard of rules and regulations"). Those obligations cannot be delegated, but a taxpayer may satisfy them through reasonable and prudent actions. [10] So, for example, a taxpayer who provides facts to an attorney and receives legal tax advice may *2014 not be negligent within the meaning of section *735 6553(a) if the legal position is questioned and possibly even if the legal position is ultimately found to be incorrect. But that same taxpayer may be negligent if the facts upon which the legal advice was rendered are unfounded or unverified. That is the case here. It has not been shown that these petitioners who claimed and/or received over $ 13,000 in tax benefits based upon a $ 5,000 "investment" were prudent or reasonable in relying upon Russell regarding factual and other matters outside of his field of expertise or knowledge. We find it particularly relevant *736 that petitioners did no outside investigation of the OEC program. We have rejected pleas of reliance when neither the taxpayer nor the "expert" relied upon (by the taxpayer) knew anything about the business. Beck v. Commissioner, 85 T.C. 557 (1985); Flowers v. Commissioner, 80 T.C. 914 (1983). Petitioners were investing substantial amounts in transactions involving assets purportedly valued at $ 65,000. We cannot treat this transaction in the same manner as a purchase of shares of stock listed on an exchange. This was to be an active (not a passive) business venture where petitioners would be, to some extent, business operators or active participants. Still, they relied solely on materials provided by the promoter, most of which they did not read thoroughly. They did not obtain independent appraisals or other reviews. See Beck v. Commissioner, supra; Elliott v. Commissioner, 84 T.C. 227 (1985), affd. without published opinion 782 F.2d 1027 (3d Cir. 1986); Fox v. Commissioner, 80 T.C. 972 (1983), affd. without published opinion 742 F.2d 1441 (2d Cir. 1984), *737 affd. sub nom. Barnard v. Commissioner, 731 F.2d 230 (4th Cir. 1984), affd. without published opinion sub nom. Zemel v. Commissioner, 734 F.2d 9 (3d Cir. 1984), affd. without published opinion sub nom. Rosenblatt v. Commissioner, 734 F.2d 7 (3d Cir. 1984), affd. without published opinion sub nom. Kratsa v. Commissioner, 734 F.2d 6 (3d Cir. 1984), affd. without published opinion sub nom. Leffel v. Commissioner, 734 F.2d 6 (3d Cir. 1984), affd. without published opinion sub nom. Hook v. Commissioner, 734 F.2d 5 (3d Cir. 1984). Petitioners did not go to any source other than their tax advisor. While the cases cited above dealt with profit objective (or the lack of it), we think the failure to verify the underlying facts by obtaining some outside information or assistance is relevant in determining whether petitioners acted reasonably under these circumstances. Moreover, the inherent structure of the OEC transaction (where "investors" received an immediate return of about three times their "investment" from tax benefits irrespective of the success of the venture) is *738 one where a profit objective is, at best, a secondary concern, if a concern at all. The actions of petitioners in these cases do not support their claims that they had an interest in profit. Petitioners did not read the offering materials in their entirety. While petitioners may not understand a complex tax opinion, they did not thoroughly review the other materials or seek technical assistance regarding the nontax aspects of this investment in which their advisor (Russell) was not versed. None of them investigated the facts which needed to be correct or true before the possibility of income could become a reality. Instead, petitioners seemed quite content to immediately receive refunds from the Government of tax paid and withheld and did not check into the details before claiming the various tax benefits. Although some petitioners made inquiries into the status of the energy system after investing in the OEC transaction and reporting the tax benefits, those inquiries were insignificant in relation to petitioners' reporting a $ 65,000 value for purposes of the $ 13,000 in tax credits without any inquiry into the basis for the value or the existence of the equipment. After all, *739 the negligence is in relation to what the taxpayers report to the Government regarding the income, deductions, and credits on their income tax returns. Petitioners were aware of the tax benefits, including the investment tax credit, when they invested. They depended on the credits for the return of monies initially invested. The value of the equipment was essential to claim tax credits. Petitioners have not shown that they exhibited care in claiming this amount on their returns without some verification of the value. Petitioners claimed and received income tax refunds that were more than double the amount of the first year's prepaid rental. We cannot ignore the extraordinary substanceless inflation of the claimed value of the units (43.33 times fair market value). Soriano v. Commissioner, 90 T.C. 44 (1988). In summary, reliance upon professional advice is "not an absolute defense to negligence * * * First it must be established that the reliance was reasonable." Freytag v. Commissioner, 89 T.C. 849, 888 (1987), affd. 904 F.2d 1011 (5th Cir. 1990); *740 see also United States v. Boyle, supra. In the setting of this case, where petitioners were actively and personally engaged in a business, it has not been shown that it was reasonable to rely upon a tax or financial advisor for business facts which were the foundation for claimed tax benefits. At least one of the petitioners (all of whom signed the tax return) in each of these consolidated cases was college educated and involved in business and professional activity. One petitioner operated a proprietorship and included a business Schedule C with respect to his business in addition to the Schedule C reflecting the OEC *2015 leasing transaction. Other petitioners were executives in insurance companies, one was a computer expert, and another a commercial airline pilot. All petitioners were earning or being compensated at least $ 50,000, and some in excess of $ 100,000 per annum. In light of petitioners' level of business and professional sophistication, education, and financial success in other endeavors they have not convinced us here that it was prudent or reasonable for them to rely upon the accountant in this case for the factual information that each of them *741 reported to respondent in order to claim entitlement to tax credits and deductions regarding their leasing business. Section 6659 Addition to Tax for Valuation Overstatements
Next, we consider whether petitioners in cases bearing docket Numbers 27353-86, 43568-86, 44611-86, 4215-87, 4317-87, and 25670-87 are liable for the addition to tax determined under section 6659 for valuation overstatements. Section 6659 provides for an addition to tax equal to 30 percent of the underpayment of tax attributable to an overvaluation of more than 250 percent. Sec. 6659(a), (b). The underpayment attributable to the valuation overstatement must be at least $ 1,000. Sec. 6659(d). A valuation overstatement exists if the fair market value (or adjusted basis) of property claimed on a return equals or exceeds 150 percent of the amount determined to be the correct amount. Sec. 6659(c). Sixty-five thousand dollars, the claimed value of each of the EMS units on the return, is substantially more than 150 percent of $ 1,500 (the correct value of each of the EMS units), resulting in a valuation overstatement.
*742 Petitioners argue that the addition should not apply because the understatement was not "attributable to" a valuation overstatement, citing Todd v. Commissioner, 89 T.C. 912 (1987), affd. 862 F.2d 540 (5th Cir. 1988). There were a number of reasons in the notice of deficiency for disallowing the credits, including, among others, that petitioners did not have a profit objective, that the EMS units were not qualifying property, that they were not placed in service, and that the units were overvalued. Because petitioners conceded the deficiency, they argue that it is impossible to determine the reason for any understatement. This issue was specifically addressed in McCrary v. Commissioner, 92 T.C. 827, 851-855 (1989), where we stated that a determination of fair market value was made only because of the disputes over the additions to tax and that we could not conclude that the taxpayer required a trial that otherwise would have been unnecessary and, accordingly, that the addition under section 6659 was not applicable. Although the value claimed for each unit exceeds 250 percent of the correct amount and the disallowed tax credits *743 for various years will result in underpayments of at least $ 1,000, section 6659 is not applicable to petitioners because we have not found that the credits were disallowed due to an overvaluation of the EMS units. This is true even though we were required to decide the value of the EMS units for purposes of other additions to tax. McCrary v. Commissioner, 92 T.C. at 854-855. Although the parties argued about whether petitioners had shown that the EMS units had not been installed prior to the end of 1982, that question was addressed because of our holding in Todd v. Commissioner, supra. With the affirmance of Todd and the issuance of our opinion in McCrary v. Commissioner, 92 T.C. at 851-855, it is unnecessary to address whether the units were placed in service because petitioners have conceded the portion of the deficiencies attributable to credits and deductions. Section 6661 Addition to Tax for Substantial Understatements
Respondent determined a section 6661[11] addition for substantial understatement of tax liability regarding the portion of the deficiency not related to the valuation overstatement for petitioners in dockets *744 numbered 43568-86, 44611-86, 4215-87, and 4317-87. Section 6661 does not apply to that portion of the understatement attributable to a valuation overstatement under section 6659. Sec. 6661(b)(3). Because respondent (in the above-listed cases) determined that part of the deficiency concerning the tax credits was attributable to overvaluation under section 6659, he determined that the remainder, concerning rent and/or installation, was attributable to a substantial understatement under section 6661. Our resolution of the section 6659 addition to tax on a basis favorable to petitioners may not be dispositive of the determination of the section 6661 addition to tax if the remaining items cause an understatement which exceeds the numerical threshold of section 6661(b)(1)(A). *745 Petitioners argue that there was substantial authority for the position taken regarding the OEC transaction. Although petitioners have not specifically indicated what that authority was or is, they pointed out that they all relied upon Russell. In this regard, petitioners' sole direction is to section 1.661-3(b)(2), Income Tax Regs., which provides that the statutory provisions *2016 may be substantial authority and that Russell's advice was based upon the statutes. Petitioners seek relief from section 6661 under section 6661(b)(2)(B). We have found that the principal purpose of these transactions is tax avoidance and, accordingly, the transactions are "tax shelters." Because we have found that the OEC transaction is a "tax shelter" within the meaning of section 6661(b)(2)(C)(ii), petitioners are to be judged under the standards of section 6661(b)(2)(C). Accordingly, petitioners must show substantial authority and that they reasonably believed that "more likely than not" their reporting of the transaction was the "proper treatment." To meet the requirements of *746 section 6661(b)(2)(C), petitioners, who rely upon their tax advisor, must meet the requirements of section 1.6661-5(d)(2), Income Tax Regs., which provides as follows: The taxpayer in good faith relies on the opinion of a professional tax advisor, if the opinion is based on the tax advisor's analysis of the pertinent facts and authorities in the manner described in section 1.6661-3(b)(3) [which holds that the weight of the authorities for the tax treatment of an item is determined by the same analysis that a court would be expected to follow in evaluating the tax treatment of an item] and unambiguously states that the tax advisor concludes that there is a greater than 50-percent likelihood that the tax treatment of the item will be upheld in litigation if the claimed tax treatment is challenged by the Internal Revenue Service. In this connection Russell (tax advisor/accountant to petitioners) testified that he did not make independent inquiry into any of the facts stated in the OEC materials. Additionally, petitioners were aware that Russell had no expertise in the energy minder business and that he did not verify the statements made by *747 OEC in the promotional materials. Additionally, Russell did not testify concerning his analysis or the details of his opinion, if any, and there is no way to determine whether his analysis complied with the statute and regulations. Accordingly, we hold that petitioners are not entitled to any reduction of the understatement under section 6661. Petitioners also argue that section 6661(c) provides authority for respondent to waive the addition to tax for reasonable cause. Section 6661(c) is similar to section 6659(e), in that respondent is permitted to waive the addition if the taxpayer shows reasonable cause and good faith regarding the understatement. Petitioners contend that their reliance upon their advisor and the offering materials shows they were acting in good faith and reasonably, and that respondent should have waived the section 6661 addition. The standard for review with respect to the section 6661(c) issue is whether respondent abused his discretion in refusing to waive the section 6661 addition to tax. Mailman v. Commissioner, 91 T.C. 1079, 1083 (1988). Abuse of discretion has been found in situations where respondent's refusal to exercise his *748 discretion is arbitrary, capricious, or unreasonable. See Estate of Gardner v. Commissioner, 82 T.C. 989 (1984); Carolina Clinchfield & Ohio Railway Co. v. Commissioner , 82 T.C. 888, 908 (1984). In considering our role in judging whether respondent abused his discretion: The administrator's judgment and ability to provide uniform treatment to similarly situated taxpayers deserves our deference. We should not substitute our judgment for his. Nevertheless, we should not refrain from judging whether his discretion has been exercised arbitrarily, capriciously, or without sound basis in fact. * * * Mailman v. Commissioner, 91 T.C. at 1084. In determining whether respondent has abused his discretion, we do not again consider whether petitioners' conduct satisfies the conditions for imposing the section 6661 addition to tax, but instead consider whether respondent has abused his discretion in denying the waiver. Mailman v. Commissioner, 91 T.C. at 1083-1084. The most important factor in determining reasonable cause and good faith is "the extent of the taxpayer's effort to assess [his] *749 proper tax liability under the law." Sec. 1.6661-6(b), Income Tax Regs. Although the record is silent regarding whether petitioners requested a waiver and submitted materials to respondent regarding same, we assume for the purpose of our consideration that a request was made and that the evidence in this record was available to respondent. The rental deductions in each case exceeded the purchase price or value of the property being rented by more than three times the actual value (value - $ 1,500, rental - $ 5,000). The amount of rental claimed was prominently reflected on all tax returns of each petitioner and most, if not all of them, have testified and argued that the device was not installed and may not have been in existence at the time they claimed the $ 5,000 rental amount. Even to the untrained eye, a $ 5,000 rental for a device worth $ 1,500 would be unreasonable. The standard here requires that the factual basis upon which the tax advisor's opinion is rendered must be correct or to some extent reasonably verified. With these unverified factual premises, we cannot find that respondent abused his discretion in his refusal to waive a part or *750 all of the understatements determined under section 6661. *2017 Our analysis of the facts of these cases, placing emphasis upon petitioners' lack of effort to assess the proper tax liability from a factual point of view is the correct focus in reviewing whether respondent abused his discretion. Having done so, we hold that reliance on a financial or tax advisor as to factual matters outside their knowledge is not a sufficient basis for finding that respondent abused his discretion in failing to waive the addition to tax. This is so here because of petitioners' failure to verify the factual aspects of their claimed business deductions and credits. That failure to verify, in the setting of these cases, is a significant factor which should be considered in deciding whether there was abuse of discretion. Section 6621(c) Additional Interest on Tax-Motivated Transactions
The final issue is the interest imposed on tax-motivated transactions imposed by section 6621(c). [12] The increased rate of interest is 120 percent of the statutory rate imposed on underpayments. Sec. 6621(c)(1). A tax-motivated transaction includes any valuation overstatement, as defined in section 6659. Sec. *751 6621(c)(3)(A)(i). The underpayment attributable to the transaction must exceed $ 1,000. Because we have decided that the underpayment is not attributable to a valuation overstatement, section 6621(c)(3)(A)(i) is not applicable. The claimed advanced rental payment deductions are, by definition, not valuation overstatements and, accordingly, would not come within section 6621(c)(3)(A)(i). Soriano v. Commissioner, 90 T.C. 44, 61-62 (1988). Respondent has argued, *752 however, that the increased rate of interest applies to the disallowed credits, advanced rental, and other expenses under other categories under section 6621. The Secretary has the authority to specify other types of transactions that will be treated as tax-motivated. Sec. 6621(c)(3)(B). Deductions disallowed for any period under section 183 relating to an activity not engaged in for profit are included in the temporary regulations, Sec. 301.6621-2T, Q-4, Temp. Proced. and Admin. Regs., 49 Fed. Reg. 50,392, 50,394 (Dec. 28, 1984). See Patin v. Commissioner, 88 T.C. 1086 (1987), affd. without published opinion sub nom. Hatheway v. Commissioner, 856 F.2d 186 (4th Cir. 1988), affd. sub nom. Skeen v. Commissioner, 864 F.2d 93 (9th Cir. 1989), affd. without published opinion 865 F.2d 1264 (5th Cir. 1989), affd. sub nom. Gomberg v. Commissioner, 868 F.2d 865 (6th Cir. 1989). All petitioners conceded that the credits and deductions were correctly disallowed by respondent. There were a number of grounds for disallowance. Petitioners have argued, in the same manner as they did for section *753 6659, that the increased interest should not apply because the understatement was not "attributable to" a tax-motivated transaction within the meaning of section 6621, citing Todd v. Commissioner, 89 T.C. 912 (1987), affd. 862 F.2d 540 (5th Cir. 1988). There were a number of reasons in the notice of deficiency for disallowing the credits, including, among others, that petitioners did not have a profit objective, that the energy minders were not qualifying property, that they were not placed in service, and that the units were overvalued. Because petitioners conceded the deficiency, they argue that it is impossible to determine the reason for any understatement. This issue was specifically addressed in McCrary v. Commissioner, 92 T.C. 827, 857-860 (1989), where we utilized the same rationale as had been used in addressing section 6659. The rationale is that because the determination of whether there was a tax-motivated transaction was made only concerning the disputes over the additions to tax and increased interest, we could not conclude that the taxpayer required a trial that otherwise would have been unnecessary. Accordingly, *754 the increased interest under section 6621 is also not applicable. To reflect the foregoing, Decisions will be entered under Rule 155. Footnotes
1. The cases of the following petitioners are consolidated with that of the Rogers' case for purposes of trial, briefing, and opinion: Leslie W. Moss and Barbara F. Moss, docket No. 43568-86; Richard B. Morgan and Betty B. Morgan, docket No. 44611-86; John M. Johnson and Dove P. Johnson, docket No. 4215-87; Robert E. McEvoy and Kathleen S. McEvoy, docket No. 4317-87; and, Royce B. Ridgeway and Melissa J. Ridgeway, docket No. 25670-87.↩
2. Respondent determined in all notices of deficiency that petitioners were liable for the increased rate of interest on tax-motivated transactions under section 6621(c)↩.
3. All section references, unless otherwise indicated, are to the Internal Revenue Code of 1954, as amended and in effect for the years at issue. All rule references are to the Tax Court Rules of Practice and Procedure.↩
*. Pursuant to section 6653(a)(1), plus 50 percent of the interest on the deficiency pursuant to section 6653(a)(2)↩.
*. Pursuant to section 6653(a)(1), plus 50 percent of the interest on the deficiency pursuant to section 6653(a)(2)↩.
*. Pursuant to section 6653(a)(1), plus 50 percent of the interest on the deficiency pursuant to section 6653(a)(2)↩.
*. Pursuant to section 6653(a)(1), plus 50 percent of the interest on the deficiency pursuant to section 6653(a)(2)↩.
*. Pursuant to section 6653(a)(1), plus 50 percent of the interest on the deficiency pursuant to section 6653(a)(2)↩.
4. These cases involve the same type leases of energy management devices as were at issue in Soriano v. Commissioner, 90 T.C. 44↩ (1988). However, in these actions petitioners seek to show only that respondent erred with respect to the additions to tax and the increased interest.
5. For reasons which remain unexplained in this record, respondent did not determine the same additions to tax in all of the notices of deficiency to the various petitioners here involved. The addition to tax for negligence under sec. 6653(a) was determined with respect to all petitioners except petitioners/Moss. The addition under sec. 6659 was determined with respect to all petitioners. The addition under sec. 6661 was determined with respect to all petitioners except petitioners/Rogers and petitioners/Ridgeway. On the morning of the trial of these consolidated cases, respondent attempted (by motion) to raise sec. 6661↩ with respect to those petitioners for whom respondent had not determined that addition to tax in the notice of deficiency. Respondent's motion was denied due to untimeliness and its prejudicial effect on the affected petitioners.
6. The term "petitioners" when used in this opinion refers to all petitioners collectively, to the extent that they participated in the OEC leasing transaction under consideration.↩
7. The reports of respondent's experts in this case, Soriano v. Commissioner, 90 T.C. 44 (1988), Kaba v. Commissioner, T.C. Memo. 1989-148, and Keenan v. Commissioner, T.C. Memo. 1989-300↩, are similar, and in many respects are identical.
8. We will briefly explain the methodology used by respondent's expert in reaching his conclusions. Discounted cash flow equals lessee's discounted percentage of energy savings minus advanced rental and installation expenses. The starting point for total energy savings is the minimum annual bill. This is projected into the future using the anticipated energy inflation rate, i.e., $ 90,000 X 10.8 percent = $ 99,720 -- the energy bill for year 2; $ 99,720 X 10.8 percent = $ 110,490 -- the energy bill for year 3, and so on. The energy savings rate is then applied to each year's annual energy bill, resulting in total projected energy savings. The lessee is entitled to 10.62 percent of this figure. The lessee's portion of savings is then discounted to present value using a 20-percent rate of return. The projection is extended for 10 years into the future, the anticipated useful life of the machines. Because the rate of return is built into the discount rate, any discounted cash flow greater than or equal to zero produces an economic profit.↩
9. The record does not include the date each petitioner filed under the referenced Act or the reason such filing was made. Petitioners offered this testimony to show that they, at some point in time, realized and/or believed that they had been duped.↩
10. We note that each petitioner herein subscribed to the jurat on their Federal income tax returns containing the following language: "Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge."↩
11. Sec. 8002(b) of the Omnibus Budget Reconciliation Act of 1986, Pub. L. No. 99-509, 100 Stat. 1874, 1951, increased to 25 percent the addition for substantial understatement, effective for additions assessed after Oct. 21, 1986. Because the addition will be assessed after that date, the 25-percent rate applies. Pallottini v. Commissioner, 90 T.C. 498↩ (1988).
12. Prior to the Tax Reform Act of 1986, subsection (c) was designated subsection (d). Sec. 1511(a), Pub. L. 99-514, 100 Stat. 2085, 2744. The additional interest applies only after Dec. 31, 1984, notwithstanding that the transaction was entered into prior to that date. Solowiejczyk v. Commissioner, 85 T.C. 552 (1985), affd. per curiam without published opinion 795 F.2d 1005 (2d Cir. 1986). Sec. 6621(c)↩ was repealed as of Dec. 31, 1989, by sec. 7721(b) of Pub. L. 101-239, 103 Stat. 2106, 2395.